UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Elizabeth E. Brown

| | |
|---|---|
| In re: ) | |
| ) | |
| KEVIN FRED McCARTHY, ) | Bankruptcy Case No. 08-28502 EEB |
| ) | Chapter 7 |
| ) | |
| Debtor. ) | |
| _____ ) | |
| ) | |
| COLORADO EAST BANK & TRUST, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary Proceeding No. 09-1076 EEB |
| ) | |
| KEVIN FRED McCARTHY, ) | |
| ) | |
| Defendant. ) | |

_____

**ORDER**
_____

THIS MATTER comes before the Court on Plaintiff's Complaint, alleging certain loan obligations owed by Debtor to Plaintiff should be nondischargeable under 11 U.S.C. § 523(a)(2)(B). Plaintiff alleges Debtor incurred the obligations through use of a false financial statement. Debtor alleges a counterclaim for willful breach of the automatic stay. Following trial on the matter, the Court finds and concludes that Debtor's obligation to Plaintiff is nondischargeable and that Plaintiff willfully violated the automatic stay.

**I. Background**

Debtor is a 63-year old businessman who recently established and operated restaurants in Colorado Springs and Pueblo, Colorado. Debtor has a college degree in history. After college he worked for the funeral home business founded by his father. When his father retired in 1988, Debtor managed the funeral home business, which included several funeral homes. Debtor left the funeral home business in approximately 2005 to start a restaurant, eventually called Andy McCarthy's Sports Grill ("Sports Grill"). The Sports Grill had two locations, one in Pueblo and one in Colorado Springs. The Sports Grill location in Colorado Springs began to suffer financially and closed in mid-2007. Debtor then helped to remodel the restaurant into Palapa's Surfside Restaurant ("Palapa's") in and around late-2007. Palapa's operated for only eight months before closing in August 2008. Debtor filed for bankruptcy on November 17, 2008 ("Petition Date"). Debtor testified that during his business career, he has provided various personal guaranties for

business debts and that he understands how a guaranty functions and that it creates personal liability in the guarantor.

The Sports Grill was owned and operated through several limited liability companies: ADUM Properties, LLC ("AP"), ADUM Properties Pueblo, LLC ("APP") and ADUM Properties Colorado Springs, LLC ("APCS"). Debtor owns a 50% interest in each of these companies. The other 50% is owned by either Mr. Wes Ursick and/or Mr. Rolf Anderson. Debtor also owns 99% of a limited liability company called McHurd Properties, LLC ("McHurd"), which owns real estate in Pueblo, and 33% of Palapa's Corporation, the C-corporation which operated Palapa's.

In connection with the restaurants, AP and APP took out various loans and incurred credit card debt. Debtor personally guaranteed some of this debt. Debtor also took out personal loans to support the business. Relevant to this case are two loans made by Plaintiff Colorado East Bank & Trust ("Bank"). Specifically, on June 27, 2007, the Bank loaned AP $175,000 pursuant to a promissory note (the "2007 Note").[1] The 2007 Note was unsecured and partially guaranteed by Debtor.[2] On February 1, 2008, the Bank loaned $105,811.85 to Debtor individually pursuant to a promissory note (the "2008 Note").[3] The 2008 Note was unsecured.

Neither the 2007 Note nor the 2008 Note (collectively, the "Notes") provided "new" money to Debtor or AP. Rather, the Notes paid off previous obligations owed by AP and Debtor to Canyon National Bank. That bank no longer wished to have unsecured loans on its books and asked for the loans to be transferred to another lending institution. Prior to issuance of the Notes, Debtor did not have a direct business relationship with the Bank. However, Debtor testified that he had personally known principals of the Bank, including President Mark Dunsmore and Vice President Michael Till, for some time prior to issuance of the Notes. Mr. Till was the loan officer in charge of the Notes. Mr. Till was also personally acquainted with the other members of AP, Wes Ursick and Rolf Anderson. Mr. Ursick made the initial contact with Mr. Till concerning the Notes.

As part of the application process for the 2007 Note, the Bank required the borrower (AP) to provide financial statements and tax returns. The Bank also required each of the personal guarantors– Mr. Ursick, Mr. Anderson and Debtor– to provide personal financial statements and tax returns. It is undisputed that prior to issuance of the 2007 Note, Debtor provided the Bank with his 2006 tax return and a signed financial statement dated June 8, 2007.[4] The financial statement showed Debtor having a net worth of $2,700,500. It is also undisputed that the financial statement

---

[1] Plaintiff's Exhibit 1.

[2] Debtor guaranteed one-third of the debt. *See* Plaintiff's Exhibit 2. Mr. Ursick and Mr. Anderson also each guaranteed one-third of the debt.

[3] Plaintiff's Exhibit 3.

[4] Plaintiff's Exhibit 4.

failed to disclose two of Debtor's liabilities: (1) a February 2006 personal guaranty of a $1.7 million loan from Colorado State Bank & Trust to APP; and (2) an April 2007 personal guaranty of $1,169,000 from the Small Business Administration to APP.[5] If these two liabilities had been reflected, the financial statement would have shown a negative net worth for Debtor. The Bank did not investigate any of the information provided on Debtor's financial report, other than to pull a credit report on Debtor. Nothing on Debtor's credit report reflected the personal guaranty liabilities Debtor omitted from his financial statement. Mr. Till testified that this loan application process complied with the Bank's usual procedures for unsecured loans.

The Bank issued the 2008 Note to Debtor approximately eight months after the 2007 Note. Because the Bank already had Debtor's financial statement, tax returns and credit report on file, it did not require Debtor to provide additional information, nor fill out a formal loan application. Instead, Mr. Till testified that the Bank relied on the information Debtor had already provided, including the June 2007 financial report.

Ultimately, AP defaulted on the 2007 Note. As of the Petition Date, the 2007 Note had an outstanding balance of $152,654.93.[6] As a partial guarantor, Debtor would be responsible for only one-third of this amount, or $50,885. Debtor also defaulted on the 2008 Note. On the Petition Date, the 2008 Note had an outstanding balance of $105,811.[7] The Bank claims the outstanding amounts on the Notes are nondischargeable under § 523(a)(2)(B).[8]

The Bank claims Debtor's financial statement was material in its decisions to make both the 2007 and 2008 Notes. The Bank argues that it would have never made the 2008 Note to Debtor if the Bank had known of the discrepancies in Debtor's financial statement. As to the 2007 Note, Mr. Till testified that if it had known of the discrepancies, the Bank would have either required full (not partial) guaranties from each guarantor or would not have made the loan at all.

Debtor responds that he had no intent to deceive the Bank. Rather, he did not list the personal guaranty obligations on his financial statement because the debts behind those guaranties were secured by real estate (owned by APP) with a substantial equity cushion. As such, Debtor did not believe his personal guaranties of the debts would ever be called on. Debtor also claims the Bank did not reasonably rely on the financial statement since the Bank did no investigation of the liabilities listed thereon.

---

[5] *See* Plaintiff's Final Pretrial Statement at 5; Defendant's Final Pretrial Statement at 1.

[6] Plaintiff's Complaint Pursuant to 11 U.S.C. § 523 at ¶ 9; Defendant's Answer and Counterclaim at ¶ 9.

[7] Plaintiff's Complaint Pursuant to 11 U.S.C. § 523 at ¶ 11; Defendant's Answer and Counterclaim at ¶ 11.

[8] Unless otherwise noted, all references to "Section," §, or the "Code" shall refer to Title 11, United States Code.

In response to the Bank's § 523(a)(2)(B) claim, Debtor filed a counterclaim against the Bank for breach of the automatic stay. Debtor's counterclaim relates to postpetition activities of Mr. Till, as representative of the Bank. Mr. Till attended Debtor's meeting of creditors. After the meeting, Mr. Till called Debtor purportedly regarding AP's 2007 Note. During the call, Mr. Till asked Debtor to "reaffirm the debt" and threatened to close the Sports Grill and McHurd Properties. Shortly thereafter, Mr. Till sent an email and a letter to Debtor, in his capacity as a member of AP.[9] Both the email and letter sought repayment of the 2007 Note. The letter further states, however, that "the Bank will begin further legal action against ADUM Properties, LLC and the three of you individually."[10] Debtor claims Mr. Till's actions willfully violated the automatic stay and asks for an award of punitive damages and attorney's fees pursuant to § 362(k).

## II. Dischargeability under § 523(a)(2)(B)

The Bank's only claim in this proceeding is under § 523(a)(2)(B). That section provides that a discharge under Chapter 7 does not discharge a debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent the debt is obtained by use of a written statement:

(I) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

The Bank has the burden to establish each element by a preponderance of the evidence.[11] Exceptions to discharge are narrowly construed, and doubts are resolved in the debtor's favor.[12]

Broken down into elements, § 523(a)(2)(B) requires this Court to find, by a preponderance of the evidence, that the debt was incurred: (1) using a written statement; (2) that is materially false; (3) respecting the debtor's or an insider's financial condition; (4) on which the creditor reasonably relied; and (5) that the debtor caused to be made or published with the intent to deceive. In this case, the parties do not dispute that Debtor provided a written personal financial statement

---

[9] Defendant's Exhibit L.

[10] *Id.*

[11] *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

[12] *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).

to the Bank to obtain the Notes, satisfying the first and third elements listed above. At issue at trial was (1) whether the financial statement was materially false; (2) whether the Bank reasonably relied on the financial statement in extending the Notes; and (3) whether Debtor provided his financial statement to the Bank with the intent to deceive.

### A. Materially False

There is no dispute that Debtor omitted two significant personal guaranty obligations from his financial statement. It is not enough, however, that a financial statement be proven false.[13] The financial statement as a whole must be *materially* false, and the burden is on the Bank to show this by a preponderance of the evidence.[14] A financial statement is materially false if it "portrays a substantially untruthful picture of a financial condition by misrepresenting information of the type which normally would affect the decision to grant credit."[15]

The parties dispute whether Debtor's omission of guaranty obligations was "material." Debtor argues the two personal guaranty obligations were not material because they did not really affect his net worth. Debtor contends that the likelihood the guaranties would ever be called on was very remote since the two debts he guaranteed were secured by real property with a significant equity cushion. The Court disagrees. The contingent nature of the guaranty obligations does not necessarily lessen the materiality of those obligations. This is especially true where the contingent liabilities are substantial and where the debtor is sophisticated and consciously aware of the existence of the liability.[16] Here, Debtor's guaranty obligations were substantial–in excess of $2.8 million. Inclusion of the liabilities would have significantly lowered Debtor's net worth. Moreover, Debtor is an experienced businessman and testified that he was aware of the guaranty obligations and that they created a personal liability. Indeed Debtor did list at least one other

---

[13] *Matter of Bogstad*, 779 F.2d 370, 373 (7th Cir. 1985).

[14] *Id.*

[15] *Blue Ridge Bank & Trust v. Cascio (In re Cascio)*, 318 B.R. 567, 573 (Bankr. D. Kan. 2004) (quoting *Lyndon Prop. Ins. Co. v. Adams (In re Adams),* 312 B.R. 576, 584 (Bankr. M.D.N.C. 2004)); *see also Rural Enters. of Oklahoma, Inc. v. Watson (In re Watson)*, 2003 WL 21241702, at *3 (10th Cir. BAP May 29, 2003) (financial statement "must paint an untruthful picture of the debtor's financial condition in such a light which would normally affect the decision on the part of the creditor to grant credit." (quoting *Red Oak Branch of Farmer's State Bank v. White (In re White)*, 167 B.R. 977, 979 (Bankr. E.D. Okla. 1994))).

[16] *See In re Watson*, 2003 WL 21241702, at *3 (rejecting debtor's argument that omission of contingent liability was immaterial); *Union Planters Bank v. Martin (In re Martin)*, 299 B.R. 234, 240 (Bankr. C.D. Ill. 2003), *aff'd*, 306 B.R. 591 (C.D. Ill. 2004) ("The failure to disclose contingent liabilities constitutes a materially false financial statement for dischargeability purposes pursuant to Section 523(a)(2)(B).").

personal guaranty obligation on his financial statement, for the Col-Terra debt.[17]  As with the $2.8 million personal guaranty obligations, Debtor testified that he did not expect his guaranty of the Col-Terra debt to be called at the time he drafted his financial statement.  Nevertheless, he included the Col-Terra obligation and not the $2.8 million guaranty obligations.  When asked why he included the Col-Terra obligation and not the others, Debtor could only say that he did not know why.  Given these circumstances, the Court finds that the omission of the $2.8 million guaranty obligations is a "significant omission" which "paints an untruthful picture" of Debtor's financial condition.[18]

In addition, Mr. Till testified that he relied on Debtor's financial statement in making both the 2007 and 2008 Notes.  In reviewing the financial statement, Mr. Till stated that he considered Debtor's net worth compared to the amount loaned in assessing risk to the Bank.  If Debtor's financial statement had included the omitted guaranty obligations, this risk analysis obviously would have changed significantly.  No evidence contradicting this evidence was presented and the Court has no reason to doubt the testimony of Mr. Till on this topic.[19]  The Court thus concludes that Debtor's financial statement was materially false.

### B. Reasonable Reliance

The reliance component of § 523(a)(2)(B) is a two-step analysis: (1) the creditor must first show that it actually relied on the financial statement and (2) that reliance must be reasonable.[20]  To establish actual reliance, the creditor must show its reliance on the false financial statement was "a

---

[17] It is unclear from the record if the Col-Terra obligation was secured or unsecured.  Debtor offered one page of the Col-Terra loan documentation as an exhibit at trial, but the Court sustained Plaintiff's objection to its admission because the document was incomplete.

[18] *In re Watson*, 2003 WL 21241702, at *3.

[19] At trial, Debtor pointed out that Mr. Till did not have ultimate authority on making either the 2007 Note or 2008 Note, because the Bank only gave Mr. Till authority to approve loans in an amount below $100,000.  Only the Bank's President, Mr. Densmore, had the ultimate authority to approve the 2007 and 2008 Notes and Mr. Densmore did not testify at trial.  Debtor, however, did not object to admission of Mr. Till's testimony as lacking in foundation or on some other basis.  Further, Mr. Till testified that, as a Vice President, he was familiar with the Bank's procedures in approving unsecured loans and that he was in charge of accounts at issue.  Mr. Till also testified that he played a role in the approval process for the Notes and that he made the approval decision together with Mr. Densmore.  As such, the Court concludes Mr. Till's testimony is competent evidence of the Bank's decision making process on the Notes.  *See Teachers Credit Union v. Johnson*, 131 B.R. 848, 855 (W.D. Mo. 1991) (finding bank officer's testimony to be competent evidence on issue of bank's reliance even though witness was not responsible for approving loans at issue).

[20] *In re Watson*, 2003 WL 21241702, at *4.

contributory cause of the extension of credit and that credit would not have been granted if the lender had received accurate information."[21] Although actual reliance must be demonstrated, a creditor does not have to show that it relied exclusively on the false financial statement.[22] It is sufficient if the creditor establishes that it partially relied on the false statement.[23]

In this case, Mr. Till testified that the Bank grants unsecured loans based on the creditworthiness and net worth of the borrower. On the 2008 Note, Debtor was the borrower. Debtor's net worth, according to Mr. Till, had a "tremendous impact" on the decision to make an unsecured loan such as the 2008 Note. As presented to the Bank, Debtor's financial statement did not present a risk because it showed a net worth of $2.7 million. Mr. Till unequivocally testified that the Bank would not have made the 2008 Note if it had known of the inaccuracies in the financial statement. This evidence was sufficient to establish actual reliance by the Bank as to the 2008 Note.

On the 2007 Note, AP was the borrower. As such, in approving the 2007 Note, Mr. Till stated that he reviewed and relied on the financial statements and tax returns of AP. Because the Bank requires personal guaranties for all commercial unsecured loans, Mr. Till stated that he also reviewed and relied on the personal financial statements and tax returns of the three personal guarantors, including Debtor. When asked if the Bank would have made the 2007 Note if it knew of the inaccuracies in Debtor's financial statement, Mr. Till indicated that the Bank either would not have made the loan or would have made it and required 100% guaranties by the guarantors. Mr. Till stated that the Bank would not be interested in an unsecured loan with partial guaranties if one of the guarantors (*i.e.* Debtor) was insolvent or highly leveraged.

Mr. Till's testimony on the 2007 Note is somewhat equivocal, since it appears that the Bank might have made the 2007 Note even if it had known of the inaccuracies on Debtor's financial statement. His testimony shows that the Bank, in addition to relying on Debtor's financial statement, also substantially relied on information provided by the other two guarantors (Mr. Ursick and Mr. Anderson) in making the 2007 Note. However, even if the Bank only partially relied on Debtor's financial statement, such partial reliance is sufficient to meet the actual reliance requirement. "It is sufficient for the creditor to show the false financial statement was a *substantial factor* in causing the extension of credit."[24] The Bank's evidence demonstrates that

---

[21] *Armstrong Rubber Co. v. Anzman (In re Anzman)*, 73 B.R. 156, 164 (Bankr. D. Colo. 1986) (quoting *In re Coughlin*, 27 B.R. 632, 637 (1st Cir. BAP 1983)).

[22] *Cent. Nat'l Bank & Trust Co. v. Liming (In re Liming)*, 797 F.2d 895, 897-98 (10th Cir. 1986).

[23] *Id.* ("[Section] 523( a)( 2)( B) does not require that a creditor rely exclusively on the false financial statement. Partial reliance is enough." (citations omitted)).

[24] *Arkansas Aluminum Alloys, Inc. v. Joyner (In re Joyner)*, 132 B.R. 436, 441 (D. Kan. 1991) (emphasis added).

7

Debtor's financial statement was at least a substantial factor in granting the 2007 Note. Accordingly, the Court concludes that the Bank showed actual reliance as to the 2007 Note.[25]

Even assuming the Bank actually relied on Debtor's financial statement, the Bank must also show that its reliance was reasonable. Reasonableness depends on the particular facts and circumstances of the case.[26] "The standard of reasonableness places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon debtor's representations."[27] In many cases, this means a creditor must take reasonable steps to verify the provided information.[28] A creditor, however, does not always have an affirmative duty to independently verify a debtor's information. A creditor's reliance may be reasonable *without* additional verifying steps where: (1) there are "ongoing relationships between the debtor and creditor;" (2) if the debtor's financial statements "contained no information indicating that further investigation was required;" (3) there is "no indication that further investigation would have uncovered the falsity of the representations;" or (4) where "the asserted failure to verify occurred after the loan had been made."[29] The issue of reasonableness is not whether it was reasonable for the Bank to have made the Notes to Debtor, but whether it was reasonable for the Bank to have relied upon Debtor's financial statements in making the Notes.[30]

Debtor argues the Bank's reliance on his financial statement was not reasonable because the Bank made no effort to verify his financial information, other than pulling a credit report. The Court disagrees. Under Tenth Circuit case law, one of the situations where a creditor is deemed to reasonably rely on a financial statement without additional investigation is where nothing in the financial statement presents a "red flag" to alert the creditor that further investigation is necessary.[31] Such "red flags" include discrepancies or inconsistent information. Here, the only supposed "red flag" Debtor points to is his listing of the Col Terra debt on his financial statement. Debtor argues this notation should have triggered additional inquiry by the Bank. Debtor's

---

[25] *See Riggs Nat'l Bank of Washington v. Ross (In re Ross)*, 180 B.R. 121, 129 (Bankr. E.D. Va. 1994) (finding reasonable reliance even though bank partially relied on existence of other guarantors and security in granting loan).

[26] *Leadership Bank v. Watson (In re Watson)*, 958 F.2d 977 (10th Cir. 1992).

[27] *In re Watson*, 958 F.2d at 978 (quoting *First Bank v. Mullet (In re Mullet)*, 817 F.2d 677, 679 (10th Cir. 1987), *abrogated in part on other grounds by Field v. Mans*, 516 U.S. 59, 63 n. 4 (1995)).

[28] *Id.* at 979.

[29] *Rural Enters. of Oklahoma, Inc. v. Watson (In re Watson)*, 2003 WL 21241702, at *4 (10th Cir. BAP May 29, 2003) (quoting *In re Mullet,* 817 F.2d at 681).

[30] *In re Watson*, 1992 WL 33245, at*3 (10th Cir. Feb. 18, 1992).

[31] *In re Watson*, 958 F.2d at 980 (quoting *In re Mullet*, 817 F.2d at 681).

financial statement, however, does not explicitly delineate the Col Terra debt as a contingent liability.  It is simply listed as one of three "Notes Payable."  The exact nature of the Col Terra debt as a guaranty obligation was only explained through Debtor's testimony at trial.  Even if the Col Terra debt had been listed as a guaranty obligation, the Court fails to see how that notation would have triggered the need for additional investigation.  The Bank still had no way of knowing of Debtor's other $2.8 million in guaranty obligations.  Moreover, nothing in Debtor's credit report alerted the Bank to the omission because Debtor's credit report did not include either the Col Terra debt or the other $2.8 million in guaranty obligations.  Mr. Till testified that he would not have expected any personal guaranty obligations to show up on the credit report in any event, since banks do not typically report such commercial guaranty liabilities.  Debtor presented no evidence that his contingent liabilities were ascertainable by any verification method such as a credit check.[32]  As such, the Court finds no "red flags" which would have alerted the Bank that further investigation was necessary.

Further evidence of the Bank's reasonableness is the existing relationship between the Bank's principals and Debtor and Mr. Anderson.[33]  Although there was no preexisting business relationship, Debtor testified he had known Mr. Till and the Bank's President for some time prior to issuance of the 2007 Note.  Debtor's business partner, Mr. Anderson, also had a long-standing relationship with Mr. Till.  Mr. Till testified that he believed Debtor's financial statement was accurate based in part on his history with Debtor.  Mr. Till further testified that the Bank issued the 2008 Note based in part on its existing relationship (through the 2007 Note) with Debtor.

Debtor points to the fact that the Bank did not require Debtor to fill out a loan application and required no additional information from Debtor prior to issuance of the 2008 Note.  Mr. Till testified, however, that it was the Bank's standard procedure not to require a formal application if the customer provided a financial statement.  In addition, the Bank did not require new information from customers if it had information that was less than one year old.  Although the Bank's mere compliance with its own business procedures is not definitive on the issue of reasonableness, it

---

[32] *See Arkansas Aluminum Alloys, Inc. v. Joyner (In re Joyner)*, 132 B.R. 436, 441 (D. Kan. 1991) (finding reasonable reliance where uncontroverted evidence indicated that investigating whether debtor had any contingent liabilities would have essentially been an impossible and futile act).

[33] *See In re Watson*, 2003 WL 21241702, at *5.

provides further evidence of the Bank's reasonableness in dealing with Debtor.[34] Accordingly, the Court concludes the Bank's reliance on Debtor's financial statement was reasonable.

### C. Intent to Deceive

The final element of § 523(a)(2)(B) is proof of intent to deceive. A creditor can prove an intent to deceive through direct evidence. Because such direct evidence is rarely available, however, wrongful intent can be inferred from the totality of the circumstances or when the other elements of § 523(a)(2)(B) have been met.[35] An intent to deceive does not mean that a debtor acted with a "malignant heart."[36] Rather, "a statement need only be made with reckless disregard for the truth to make the underlying debt nondischargeable under § 523(a)(2)(B)."[37] A debtor's mere "unsupported assertions of an honest intent will not overcome the natural inferences from admitted facts."[38] In the guaranty context, courts have held that "[t]he omission of a substantial contingent liability which could not have merely been an oversight serves as evidence of an intent to deceive a lender."[39]

The Court finds there is sufficient evidence to infer that Debtor acted with a reckless disregard for the truth. Debtor is an experienced businessman, having managed and developed

---

[34] *See Blue Ridge Bank & Trust v. Cascio (In re Cascio)*, 318 B.R. 567, 574 (Bankr. D. Kan. 2004) (reliance not reasonable where bank failed to comply with its own policy of ensuring secondary source of repayment). In determining reasonableness, courts also consider the standards or customs of the creditor's industry in evaluating credit-worthiness. *Id.* The parties in this case, however, did not provide any evidence regarding the standards utilized by the banking industry to review and assess financial statements. As such, the Court is unable to determine whether the Bank's conduct could have fallen within such standards.

[35] *See Driggs v. Black (In re Black)*, 787 F.2d 503, 505-506 (10th Cir. 1986) ("requisite intent may be inferred from a sufficiently reckless disregard of the accuracy of the facts"), *abrogated on other grounds by Grogan v. Garner*, 498 U.S. 279 (1991); *Rural Enters. of Oklahoma, Inc. v. Watson (In re Watson)*, 2003 WL 21241702, at *7 (10th Cir. BAP May 29, 2003) ("when the other elements under § 523(a)(2)(B) are met, the intent to deceive element may be inferred.").

[36] *Heritage Bank of St. Joseph v. Bohr (In re Bohr)*, 271 B.R. 162, 169 (Bankr. W.D. Mo. 2001) (citing *Agribank v. Webb (In re Webb)*, 256 B.R. 292, 297 (Bankr. E.D. Ark. 2000)).

[37] *Cent. Nat'l Bank & Trust Co. v. Liming (In re Liming)*, 797 F.2d 895, 897 (10th Cir. 1986).

[38] *Id.* (quoting 3 Collier on Bankruptcy ¶ 523.09[5][b], at 523-62 (Lawrence P. King ed., 15th ed. 1981)).

[39] *Union Planters Bank v. Martin (In re Martin)*, 299 B.R. 234, 243 (Bankr. C.D. Ill. 2003), *aff'd*, 306 B.R. 591 (C.D. Ill. 2004).

several businesses. By his own admission, Debtor is quite familiar with business loans and personal guaranties, having provided such guaranties on several occasions. Debtor admits he fully understood the nature of his guaranty obligations and that they represented a personal liability on his part. Debtor also admits that, regardless of this knowledge, he chose not to list the $2.8 million in guaranty obligations on his financial statement. Debtor argues the omission was not made with an intent to deceive because he honestly believed that the $2.8 million guaranty obligations would never be called on. Even if this statement were true, Debtor's belief does not contradict an inference of reckless disregard because it demonstrates that his failure to disclose the guaranties was not a mere oversight.[40] Moreover, the Court finds Debtor's explanation somewhat disingenuous given that he *did* choose to list the Col Terra guaranty obligation on his financial statement, even though he did not believe that obligation would be called on at the time. This evidence demonstrates not only that Debtor understood the need to list contingent liability on the financial statement but also that Debtor consciously chose which of his guaranty obligations to list and which to omit. Based on this evidence and the circumstances of the case, the Court finds Debtor acted with a reckless disregard for the truth.[41]

### D. Amount of the Bank's Nondischargeable Claim

Based on the totality of the facts, circumstances, and applicable law, the Court concludes that the Bank reasonably relied, to its detriment, on the Debtor's materially false written financial statement, which the Debtor published with an intent to deceive. Because the Bank has carried its burden of proof on every element in § 523(a)(2)(B), the Court finds that Debtor's debt to the Bank should be excepted from the Debtor's discharge.

Debtor admits that, as of the Petition Date, the total amount owed on the 2007 Note is $152,654.93. Of this amount, Debtor guaranteed one-third, or $50,885. Debtor also admits that, as of the Petition Date, the total amount owed on the 2008 Note is $105,811.85. Accordingly, the

---

[40] *See Id.* at 243-44 (finding debtor's belief that personal guaranty obligations would not be called on did not alter the fact that the debtor intentionally deceived the bank by failing to disclose guaranty obligations); *Signet Bank/Virginia v. Wingo (In re Wingo)*, 113 B.R. 249, 252 (W.D. Va. 1989) (finding evidence of intent to deceive despite debtor's claim of ignorance of nature of guaranty liability where testimony indicated debtor was aware of personal nature of obligation).

[41] *Union Planters Bank v. Martin (In re Martin)*, 306 B.R. 591, 606 (C.D. Ill. 2004) (conscious decision by a sophisticated businessman to omit $23,000,000.00 in personal guaranties from his financial statement because he deemed them not to be liabilities raised an inference of an intent to deceive); *Arkansas Aluminum Alloys, Inc. v. Joyner (In re Joyner)*, 132 B.R. 436, 442 (D. Kan. 1991) (omission of significant contingent liabilities in the financial statement was strong evidence of an intent to deceive); *In re Wingo*, 113 B.R. at 251-52 (finding intent to deceive despite debtor's claim of ignorance where evidence demonstrated debtor understood personal responsibility to pay contingent debt); *Riggs Nat'l Bank of Washington v. Ross (In re Ross)*, 180 B.R. 121, 130 (Bankr. E.D. Va. 1994) (finding intent to deceive where evidence showed it was highly unlikely debtor simply forgot to list guaranty obligation).

Bank's claim totaling $156,696.85, less any amounts collected postpetition, is nondischargeable pursuant to § 523(a)(2)(B).

## II. Willful Violation of the Automatic Stay

In his counterclaim, Debtor alleges the Bank violated the automatic stay when Mr. Till called Debtor postpetition and sent Debtor a letter and email concerning collection of the 2007 Note. The Bank responds that Mr. Till contacted Debtor only in his role as member of AP and that Mr. Till's actions did not violate that stay because Mr. Till did not actually commence any action against Debtor.

The scope of the automatic stay is extremely broad.[42] The provisions of § 362(a) "provide[] for a broad stay of litigation, lien enforcement, and other actions, judicial or otherwise, which would affect or interfere with property of the estate, property of the debtor, or property in the custody of the estate."[43] Subsection 362(a)(6) specifically stays "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." This prohibition includes "threats of immediate action by creditors."[44] Given the broadness of the automatic stay, "[a]s a practical matter, the stay will, in most situations, enjoin a creditor from sending letters and other correspondences to the debtor."[45] This includes informal contact with the debtor, such as phone calls, designed to collect a prepetition debt.[46]

Of course, not all communications between a creditor and a debtor are prohibited. For example, the sending of informational account statements and notifications will not violate the automatic stay as long as the statements or notifications are not coercive.[47] In addition, certain

---

[42] *Cuffee v. Atlantic Bus. & Cmty. Dev. Corp. (In re Atlantic Bus. & Cmty. Corp.)*, 901 F.2d 325, 327 (3d Cir. 1990); *Parks v. Progressive Northern Ins. Co. (In re Hokanson)*, 383 B.R. 548, 556-57 (Bankr. D. Kan 2008) ("The stay of section 362 is extremely broad in scope and, aside from the limited exceptions of subsection (b), applies to almost any type of formal or informal action taken against the debtor or the property of the estate . . . .") (quoting 3 Collier on Bankruptcy ¶ 362.03, at 362-12.12 (Lawrence P. King ed., 15th ed. 2005).

[43] *Sec. Investor Protection Corp. v. Blinder, Robinson & Co., Inc.*, 962 F.2d 960, 965 (10th Cir. 1992) (quoting 2 Collier on Bankruptcy ¶ 362.01, at 362-8 to-9 (15th ed. 1992)).

[44] *In re Radcliffe*, 563 F.3d 627, 630 (7th Cir. 2009).

[45] *Harris v. Mem'l Hosp. (In re Harris)*, 374 B.R. 611, 614 (Bankr. N. D. Ohio 2007).

[46] *Jacobs v. Honda Fed. Credit Union (In re Jacobs)*, 321 B.R. 451, 453 (Bankr. N.D. Ohio 2004).

[47] *E.g.*, *Pultz v. Novastar Mortgage, Inc. (In re Pultz)*, 400 B.R. 185, 190-92 (Bankr. D. Md. 2008) ("The automatic stay does not bar a lender from notifying a debtor of an escrow deficiency or from making other notification . . . ."); *Connor v. Countrywide Bank (In re Connor)*,

creditor activities which are sanctioned by the Bankruptcy Code have been held not to violate the stay, such as solicitation and negotiation of a reaffirmation agreement.[48] Even in the reaffirmation context, however, a stay violation may still exist if a creditor's actions are coercive or otherwise harassing in nature.[49] Determining whether a particular creditor communication violates the automatic stay "depends on such specifics as what type of communication was sent to the debtor and whether the communication had a purpose other than collection of the debt outside the scheme contemplated by the Bankruptcy Code."[50] On a motion for sanctions for violation of the automatic stay, the burden of proof is on the debtor to establish by a preponderance of the evidence that a violation occurred, the violation was committed willfully, and the violation caused actual damages.[51]

### A. Violations of the Automatic Stay

In this case, Debtor alleges the following action violated the stay: (1) Mr. Till's December 17, 2008 phone call to Debtor in which Mr. Till asked Debtor to "reaffirm the debt;" (2) Mr. Till's December 18, 2008 letter ("Letter") to AP's members, including Debtor, concerning the 2007 Note. The Court concludes that both of these actions were a willful violation of the automatic stay.

As to the phone call, the Bank does not dispute that Mr. Till, on behalf of the Bank, telephoned Debtor concerning the 2007 Note and that during the conversation Mr. Till asked Debtor to "reaffirm the debt." The Bank also does not appear to contest Debtor's assertion that, during the phone call, Mr. Till threatened to close the Sports Grill and McHurd Properties and that Mr. Till was confrontational during the phone call. The Court notes that Mr. Till elected not to testify on this topic and so Debtor's version of events is uncontested and, in the Court's evaluation, credible. The Bank argues that Mr. Till called Debtor only as a member of AP with regards to AP's debt under the 2007 Note. Because AP is not in bankruptcy, the Bank contends the phone call is not a violation of the stay. Debtor points out that the Debtor could only reaffirm a personal debt and, as such, Mr. Till must have been referring to Debtor's personal guaranty of one-third of the 2007 Note.[52]

---

366 B.R. 133, 137-38 (Bankr. D. Haw. 2007) (monthly statements sent by mortgage company did not violate stay).

[48] *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 423 (6th Cir. 2000).

[49] *Id.*

[50] *Cousins v. CitiFinancial Mortgage Co. (In re Cousins)*, 404 B.R. 281, 287 (Bankr. S.D. Ohio 2009).

[51] *Johnson v. Smith (In re Johnson)*, 501 F.3d 1163, 1172 (10th Cir. 2007).

[52] Basically, a reaffirmation is "a voluntary agreement to hold an otherwise dischargeable obligation, nondischargeable." *Jacobs v. Honda Fed. Credit Union (In re Jacobs)*, 321 B.R. 451, 453 (Bankr. N.D. Ohio 2004).

The Court agrees that when Mr. Till asked about reaffirmation, he was referring to Debtor's personal guaranty of the 2007 Note. Debtor's guaranty obligation is a prepetition debt and the automatic stay prohibits the Bank from seeking to collect that debt. It is true that the automatic stay does not prohibit a creditor from merely seeking a reaffirmation agreement from a debtor. The circumstances of the call, however, lead the Court to conclude Mr. Till was not simply making a reaffirmation solicitation. First, the reaffirmation process is typically utilized (although not actually limited to) the situation where a debtor seeks to keep encumbered property.[53] Debtor's obligation to the Bank was an unsecured personal guaranty. Debtor had no apparent reason or incentive to voluntarily reaffirm the debt. As such, it seems unlikely that Mr. Till honestly believed a reaffirmation was possible. In addition, Mr. Till's reaffirmation request was accompanied by a threat to close the Sport's Grill and McHurd Properties. Although the Sport's Grill was owned and operated by AP, it along with McHurd Properties, represent Debtor's primary source of income. This threat pushed Mr. Till's call over the line from mere reaffirmation solicitation to a coercive act to collect on a prepetition debt. The Court therefore concludes that the call violated the automatic stay.

As to Mr. Till's Letter, the Bank again argues that it related only to AP's obligation to pay the 2007 Note and thus does not constitute a stay violation. While it is true that the Letter is addressed to AP and concerns repayment of the 2007 Note, it was directed and delivered to the three members of AP, Mr. Anderson, Mr. Ursick and Debtor. The Letter states Mr. Till's belief that the Bank "has every right to pursue the three of you personally . . . and that is our full intention."[54] The Letter goes on to demand payment of past due amounts on the 2007 Note and to state that "[i]f this is not done, the Bank will begin further legal action against [AP] and the three of you individually."[55] Pursuing Debtor "individually" or "personally" necessarily refers to Debtor's guaranty obligation on the 2007 Note. Thus the Letter demands payment of a prepetition debt from Debtor and threatens immediate action if payment is not made. The Court therefore concludes that the Letter constitutes a violation of the automatic stay.

### B. Damages for Stay Violations

In order to impose sanctions against the Bank for its violations of the stay, the Court must first find that its actions were "willful." A willful violation of the automatic stay occurs if the party knew of the automatic stay and intended to take the actions that violated the stay.[56] No specific intent to violate the stay is required.[57] A party's good faith belief that it has a right to the property

---

[53] *Id.*

[54] Defendant's Exhibit L.

[55] *Id.*

[56] *In re Gagliardi*, 290 B.R. 808, 818 (Bankr. D. Colo. 2003).

[57] *Johnson v. Smith (In re Johnson)*, 501 F.3d 1163, 1172 (10th Cir. 2007).

is not relevant to a determination of whether the act was "willful" or whether compensation must be awarded.[58] Once a court finds a violation of the stay to be willful, § 362(k) makes the award of damages for injuries mandatory.[59]

The Bank does not deny that it had notice of Debtor's bankruptcy case and the existence of the automatic stay. The Bank also does not deny that Mr. Till intended to make the phone call and send the Letter to Debtor. The Bank notes that Mr. Till contacted the U.S. Trustee's office before corresponding with Debtor concerning the 2007 Note. The U.S. Trustee's office purportedly told Mr. Till that the Bank could continue collection efforts against AP concerning the 2007 Note. This may be true, but Mr. Till's good faith belief he had the right to contact Debtor is not relevant in determining willfulness. Moreover, any right the Bank has to pursue AP postpetition does not include the right to pursue Debtor individually for his personal guaranty obligation. Accordingly, the Court finds that the Bank's actions were willful, entitling Debtor to recover damages.

Debtor bears the burden of proving actual damages with reasonable certainty.[60] At trial, Debtor limited his request for damages to punitive damages and attorney's fees. Because Debtor has not alleged any other compensable injury resulting from the Bank's actions, the Court finds an award of attorneys' fees is appropriate.[61] Section 362(k) does not specify any standard a court is to employ when making an award of attorney fees. Most courts, however, apply a reasonableness standard.[62] Keeping this standard in mind, the Court orders Debtor to submit a bill of costs that reflects the fees and costs Debtor incurred prosecuting his § 362(k) claim.

In order for punitive damages to be awarded under § 362(k), Debtor must show that Mr. Till acted with actual knowledge that he was violating a federally protected right or with reckless disregard of whether he was doing so.[63] The primary purposes of an award of punitive damages are punishment and deterrence.[64] The five primary factors to be considered in determining whether to award punitive damages include: the nature of the creditor's conduct; the creditor's ability to pay damages; the level of sophistication of the creditor; the creditor's motives; and any provocation by the debtor.[65]

---

[58] *In re Gagliardi*, 290 B.R. at 818.

[59] *Id.* at 819.

[60] *Id.*

[61] *See id.* at 819-20 (awarding attorney's fees).

[62] *Eskanos & Adler, P.C. v. Roman (In re Roman)*, 283 B.R. 1, 11-12 (9th Cir. BAP 2002).

[63] *In re Gagliardi*, 290 B.R. at 820.

[64] *Id.*

[65] *Id.*

In this case, there was no evidence of any menacing or violent actions by Mr. Till. In addition, Mr. Till called the U.S. Trustee's office before contacting Debtor in an attempt to verify his right to pursue payment of the 2007 Note. On the other hand, it goes without saying that the right to pursue AP does not include a right to pursue Debtor individually. Mr. Till did not limit his actions to AP and he threatened Debtor's source of income. The Court therefore finds that Mr. Till demonstrated a reckless disregard for whether he was acting in violation of the automatic stay.

Debtor did not introduce any evidence regarding the ability of the Bank to pay sanctions. Nevertheless, the fact that the Bank is a going concern still making loans indicates that it is capable of paying at least a minimal award. Mr. Till's testimony also indicates that the Bank is a sophisticated lender that regularly makes commercial loans. While it does not appear that Mr. Till acted out of an improper motive, nothing done by Debtor provoked Mr. Till's actions. Given these factors, the character of the stay violations, and in order to deter future misconduct, the Court finds that it is appropriate to award punitive damages in the amount of $1,000.

**IV. CONCLUSION**

Accordingly, it is hereby ORDERED that:

1. The Bank's claim totaling $156,696.85, less any amounts collected postpetition, is nondischargeable pursuant to § 523(a)(2)(B);

2. Debtor shall submit a bill of costs reflecting the fees and costs Debtor incurred prosecuting his § 362(k) claim; and

3. Debtor is hereby awarded punitive damages in the amount of $1,000.

DATED this 30th day of November, 2009.

BY THE COURT:

Elizabeth E. Brown
United States Bankruptcy Judge